UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.

SECURITIES AND EXCHANGE
COMMISSION,

        Plaintiff,

v.

FRANCISCO J. HERRERA,

        Defendant.

_____/

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff Securities and Exchange Commission (the "Commission") alleges:

## I.    INTRODUCTION

1. From at least March 2021 through November 2022 ("Relevant Period"), Defendant Francisco J. Herrera ("Herrera"), personally and through a team of sales agents he managed, solicited and raised approximately $10 million from about 190 investors nationwide for Wells Real Estate Investment, LLC ("Wells").

2. Wells, its owner, Janalie C. Joseph a/k/a Janalie C. Bingham ("Bingham"), and her husband, Jean Joseph ("Joseph"), an undisclosed felon control person, orchestrated a fraudulent, unregistered securities offering from at least January 2020 to April 2024. They raised at least $56 million, through the sale of promissory notes titled Memorandum of Indebtedness (the "Notes"), from approximately 660 investors nationwide. They claimed that Wells would use investor funds to acquire and improve income-producing properties primarily located in South Florida, and that their investments would be secured by real estate assets. In reality, they made Ponzi-like payments with new investor funds to pay older investors, used investor funds to pay undisclosed commissions to sales agents, and lied about the size, value, and operations of Wells's real estate

portfolio, all while Bingham and Joseph misappropriated investors funds. Wells's investors were not told about these material facts when they purchased the Notes.

3. Wells collapsed in August 2024 when the Commission filed its emergency action to stop the fraudulent scheme in the United States District Court for the Southern District of Florida. *SEC v. Wells Real Estate Investment, LLC*, No. 24-cv-80980 (S.D. Fla. Aug. 14, 2024) ("Wells Case"). Among other relief, the Commission obtained the appointment of a receiver over Wells and its subsidiaries.

4. Herrera played a large role in soliciting and raising money from investors for Wells. Herrera led a team of sales agents, who were located in multiple states and solicited investors to purchase the Notes. He also promoted the Notes on the internet and on his radio program. Herrera received at least $488,244 in transaction-based commissions tied to investor purchases of the Notes.

5. Furthermore, during the Relevant Period, Herrera was not registered with the Commission as a broker-dealer, and was not associated with a registered broker-dealer. Wells's securities offering was not registered with the Commission, nor did it qualify for an exemption from registration. Herrera thus was not permitted to sell Wells's securities.

6. By engaging in this conduct, Herrera violated Sections 5(a) and (c) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77e(a) and 77e(c), and Section 15(a)(1) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78o(a)(1). Unless enjoined, Herrera is reasonably likely to continue to violate the federal securities laws.

## II.   DEFENDANT

7.      **Herrera** resides in San Jose, California, and holds a life insurance license and mortgage loan originator license. He works as a life insurance agent and operates through his company, Confia Financial Corporation ("Confia Financial").

## III.   OTHER RELEVANT ENTITIES AND INDIVIDUALS

8.      **Wells** is a Wyoming limited liability company with its principal place of business in West Palm Beach, Florida. Wells acquired, sold, borrowed against, and managed commercial and residential real estate and was controlled by Bingham and Joseph. On August 14, 2024, the Court in the Wells Case granted the Commission's motion to appoint a receiver over Wells and its subsidiaries. Wells Case at DE 11. On October 17, 2024, the same Court entered a Judgment for Permanent Injunctive Relief against Wells. *Id.* at DE 71.

9.      **Bingham** is a resident of Boca Raton, Florida, and was Wells's founder, CEO, and 100% owner. While operating Wells, Bingham was married to Joseph, and together they controlled Wells. On December 5, 2024, the Court in the Wells Case entered a Judgment for Permanent Injunctive Relief against Bingham. *Id.* at DE 83. After the Wells Case was filed, a federal grand jury indicted Bingham for one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, and ten counts of wire fraud, in violation of 18 U.S.C. § 1343, based on the facts underlying the Wells Case. *U.S. v. Joseph, et al.*, No. 25-cr-20483 (S.D. Fla. Oct. 30, 2025) ("Criminal Case"). On February 17, 2026, Bingham pleaded guilty to conspiracy to commit wire fraud under 18 U.S.C. § 1349. *Id.* at DE 62.

10.     **Joseph** is currently in federal detention. Joseph is the former manager of Evergreen United Investments, LLC ("Evergreen"). In April 2019, a federal grand jury indicted Joseph and Evergreen on one count of wire fraud in violation of 18 U.S.C § 1343. *See U.S. v. Joseph*, No. 19-

cr-20177 (S.D. Fla. Apr. 4, 2019). Joseph pleaded guilty in November 2019, was sentenced to 15 months imprisonment, and was ordered to pay approximately $3 million in restitution.

11.     On December 3, 2024, the Court in the Wells Case entered a Judgment for Permanent Injunctive Relief against Joseph. *Id.* at DE 81. After the Wells Case was filed, a federal grand jury indicted Joseph for one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, and ten counts of wire fraud, in violation of 18 U.S.C. § 1343, based on the same facts underlying the Wells Case. Criminal Case at DE 1. On March 17, 2026, following the filing of a superseding indictment, Joseph pleaded guilty to one count of conspiracy to commit money laundering under 18 U.S.C. § 1956(h). *Id.* at DE 73-75. On June 11, 2026, Joseph was sentenced to 240 months of imprisonment.

12.     **Confia Financial** is an Illinois corporation owned and operated by Herrera. Through Confia Financial, Herrera managed sales agents, located in Arizona, Colorado, and New Mexico, who sold the Notes.

## IV.     JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d), and 77v(a), and Sections 21(d), 21(e), and 27 of the Exchange Act 15 U.S.C. §§ 78u(d), 78u(e), and 78aa.

14.     Under the Securities Act and Exchange Act, this Court has personal jurisdiction over Herrera and venue is proper in the Southern District of Florida because: (a) the Wells securities offering that Herrera participated in took place in this District; (b) a substantial part of the events or omissions giving rise to the violations of the Securities Act and the Exchange Act occurred in the District; and (c) Herrera directed investors to send checks to Wells's West Palm

4

Beach, Florida office and to wire transfer funds to Wells's South Florida bank accounts. Further, Herrera has consented to the Court's jurisdiction.

15.     In connection with the conduct alleged in this Complaint, Herrera, directly and indirectly, singly or in concert with others, made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation or communication in interstate commerce, and of the mails.

## V.     FACTUAL ALLEGATIONS

### a.  Wells's Unregistered Securities Offering

16.     Wells held itself out to the public through its website and in marketing and offering materials as a "real estate acquisition and development company that focuses on identifying, acquiring, and managing value-added residential and commercial real estate assets in strategically targeted locations in the United States. . ." The website touted Wells's "Prudent Decision-Making, Rigorous Analysis, And A Focus on Sustainable Growth By Building Green Communities And Stronger Families One Investment At A Time."

17.     The Notes were offered to the public as investments, with terms between 12-to-36 months. Depending on the term selected by the investor, the Notes offered different interest rates, 10% to 12% annual interest on 18- and 28-month notes, or a lump-sum 99% interest payment at the end of a 36-month note. Other than selecting the term length, investors had no ability to negotiate the terms of the Notes, and relied on form promissory note documentation provided by Wells and distributed by Herrera or one of the sales agents working for Confia Financial, which was owned and operated by Herrera.

18. Investors in the Notes had no ability to select properties purchased by Wells, to manage those properties, or to make decisions about Wells's real estate portfolio. Wells retained all decision-making power with respect to its real estate portfolio.

19. Wells told investors that it would use funds raised from the sale of Notes to invest in and manage real estate, purportedly to generate income and enhance asset values, and that the Notes were collateralized by real estate owned by Wells.

20. The Notes constitute investment contracts and are, therefore, securities because investors contributed money into a common enterprise in which their fortunes were inextricably tied to Wells's success, as the company selected, acquired, and managed the real estate and business activities that were supposed to generate returns. Moreover, investors reasonably expected profits to come solely from the entrepreneurial and managerial efforts of Wells and Bingham, and did not exercise any control over Wells's business activities. The Notes also are promissory notes constituting securities because they had terms longer than nine months, were sold with the purpose of raising money for the general use of the business enterprise and to finance substantial investments, and investors were interested primarily in the profit the Notes were expected to generate.

21. During the Relevant Period, Wells's offering was not registered with the Commission and the offering had no applicable exemption from registration.

**b. Wells's Material Misrepresentations to Investors and Misuse and Misappropriation of Investor Funds**

22. Wells fraudulently raised approximately $56 million from about 660 investors by selling the Notes, predominantly through a network of independent sales agents, including Herrera who raised a significant amount of investor funds.

23.     Wells was a fraudulent scheme through and through. Among other things, Wells: (i) misrepresented to investors the size, value, and operations of Wells's real estate portfolio and hid that the real estate was already heavily mortgaged; (ii) used investor money to pay exorbitant transaction-based commissions to sales agents who raised investor funds; (iii) used newer investor funds to pay older investors; (iv) secretly gambled and lost millions of dollars of investor funds on highly speculative futures and options contracts; and (v) misappropriated investor funds and transferred them to Wells's CEO Bingham and her husband, Joseph, a convicted felon and undisclosed control person, for their personal use and benefit.

24.     Many of the investors who purchased the Notes incurred catastrophic losses, including losing retirement funds.

### c. Herrera's Offer and Sale of Securities in Unregistered Transactions While Acting as an Unregistered Broker

25.     Herrera played a significant role in raising investor money for Wells.

26.     During the Relevant Period, from his then-residence in Illinois, Herrera personally, and through his sales team based in Arizona, Colorado, and New Mexico, solicited investors on behalf of Wells and raised approximately $10 million from about 190 investors in multiple states, including seniors and unaccredited investors.

27.     Herrera promoted the Notes to investors through social media such as YouTube, LinkedIn, and Instagram, and on his Spanish-language radio show "Duplica Tu Dinero" (translated to "Double Your Money"). Approximately fifty percent of investors Herrera sold Notes to originated from his radio show.

28.     During the time that he was offering and selling the Notes, Herrera visited Wells's office in West Palm Beach, Florida several times and met with Bingham to learn more about the company's operations. Herrera used the information provided by Wells and Bingham, including

7

information about Wells's operations and investment activities, to solicit investors and to sell the Notes.

29.     Herrera told investors and prospective investors that Wells would use their funds to invest in and manage real estate, and that the Notes were collateralized by real estate owned by Wells.

30.     Herrera explained to investors that, while there were risks, their investments were collateralized by real estate owned by Wells and should be safe.

31.     Herrera provided and discussed Wells's promotional and sales materials with investors, and instructed them on how to invest in Wells. When Herrera sold Notes, he personally, or through one of his sales agents, directed the investor to send their investment funds via check to Wells's West Palm Beach, Florida office, or via wire transfer to Wells's bank accounts which were opened and operated from South Florida.

32.     Herrera also assisted investors in opening self-directed IRA accounts at a financial institution so that tax-deferred retirement account funds could be used to purchase the Notes.

33.     Herrera received at least $488,244 in transaction-based sales commission payments from Wells, some of which were routed through his company, Confia Financial, and were ultimately paid to Herrera.

34.     Herrera did not take reasonable steps to verify that investors were accredited and sold Notes to unaccredited investors.

35.     Upon information and belief, Herrera continued selling other unregistered securities after he stopped soliciting investors for Wells's Notes.

36.     Neither Herrera nor Confia Financial has ever held any securities licenses or been associated with any entity registered with the Commission.

8

37.     Herrera voluntarily executed tolling agreements with the Commission tolling and suspending all applicable statute of limitations from February 23, 2026, through June 24, 2026.

## VI.     CLAIMS FOR RELIEF

### Count I
### Violations of Securities Act Sections 5(a) and (c)

38.     The Commission repeats and realleges Paragraphs 1 through 37 of this Complaint.

39.     No registration statement was filed or in effect with the Commission pursuant to the Securities Act with respect to the Notes offered and sold by Herrera as described in this Complaint and no exemption from registration existed for those securities.

40.     From approximately March 2021 to November 2022, Herrera directly and indirectly:

    a. made use of any means of transportation or communication in interstate commerce or of the mails to sell securities, through the use or medium of a prospectus or otherwise;

    b. carried or caused to be carried securities through the mails or in interstate commerce, by any means or instruments or transportation, for the purpose of sale or delivery after sale; or

    c. made use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security;

without a registration statement having been filed or being in effect with the Commission as to such securities.

9

41.     By reason of the foregoing, Herrera violated and, unless enjoined, is reasonably likely to continue to violate Sections 5(a) and (c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).

**Count II**
**Violations of Exchange Act Section 15(a)(1)**

42.     The Commission repeats and realleges Paragraphs 1 through 37 of this Complaint.

43.     From approximately March 2021 to November 2022, Herrera, directly or indirectly, by use of the mails or any means or instrumentality of interstate commerce, effected transactions in, or induced or attempted to induce the purchase or sale of securities, while he was not registered with the Commission as a broker or dealer or when he was not associated with an entity registered with the Commission as a broker-dealer.

44.     By reason of the foregoing, Herrera violated and, unless enjoined, is reasonably likely to continue to violate Section 15(a)(1) of the Exchange Act, 15 U.S.C. § 78o(a)(1).

## VII.    RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that the Court find Herrera committed the alleged violations, and:

### a.    Permanent Injunctive Relief

Issue permanent injunctions enjoining Herrera from violating Sections 5(a) and (c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c), and Section 15(a)(1) of the Exchange Act, 15 U.S.C. § 78o(a)(1).

### b.    Disgorgement and Prejudgment Interest

Issue an order directing Herrera to disgorge all ill-gotten gains or proceeds received from the acts and/or conduct described in this Complaint, including prejudgment interest thereon,

pursuant to Exchange Act Sections 21(d)(3), (d)(5), and (d)(7), 15 U.S.C. §§ 78u(d)(3), (d)(5), and (d)(7).

### c. **Civil Penalties**

Issue an order directing Herrera to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

### d. **Further Relief**

Grant any other relief that the Court deems necessary and appropriate.

### e. **Retention of Jurisdiction**

Further, the Commission requests that the Court retain jurisdiction over this action and over Herrera in order to implement and carry out the terms of all orders and decrees that may hereby be entered, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of the Court.

## VIII.   **DEMAND FOR JURY TRIAL**

The Commission demands a trial by jury on any and all issues so triable.

Dated:  June 23, 2026    Respectfully submitted:

By: /s/Brian Lechich
  Brian Lechich, Esq.
  Florida Bar No. 84419
  Senior Trial Counsel
  Email: LechichB@sec.gov
  Phone: (305) 416-6257
  *Lead Attorney*

  and

  Hughens Dolisca, Esq.
  Florida Bar No. 99744
  Senior Counsel
  Email: DoliscaH@sec.gov
  Phone: (305) 982-6344

  **ATTORNEYS FOR PLAINTIFF**
  **SECURITIES AND EXCHANGE**
  **COMMISSION**
  801 Brickell Avenue, Suite 1950
  Miami, FL 33131
  Telephone: (305) 982-6300